**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TERRY JENSEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | 11 C 8755 |
| v. | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **STYROLUTION AMERICA, LLC,** | ) | |
| **a/k/a INEOS NOVA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Terry Jensen sued Styrolution America, LLC ("Styrolution"), pursuant to Title VII for sexual harassment and retaliation. The case is before the Court on Styrolution's motion for summary judgment. For the reasons set forth below, the motion is granted.

**Facts**

Jensen was employed as an operator in Styrolution's chemical production unit. (Pl.'s Resp. Def.'s Stmt. Fact, Dkt. # 36, ¶ 3). Jensen claims that he was sexually harassed by a co-worker, Craig Hefele, who worked as a laboratory technician in Styrolution's Technology Department from March 13, 2008 until his termination on September 16, 2010. (*Id*. ¶ 4.) The alleged harassment occurred while Jensen and Hefele worked on the D Crew (a/k/a "D shift") from approximately February 2009 through March 2010. (*Id*. ¶ 5.) Although working the same shift, Jensen and Hefele worked in different departments with different supervisors. (*Id*.)

In his annual performance and development review ("PDR") for 2006, while working on C Crew, Jensen received a "partially meets requirements" concerning teamwork. (*Id*. ¶ 7.) His write-up for teamwork included the following: "[Jensen] has to work on his respect for all his teammates. . . . [Jensen] sometimes has trust issues with some of his teammates and I will need for [him] to drastically improve in the particular category because if he doesn't he will face disciplinary actions because he has been warned before not to continue in this manner." (*Id*.) His annual PDR for 2007, also prepared while Jensen was on C Crew, states that "[a]though [he] meets requirements [for teamwork] he is at the very bottom end in regards to respect for individuals, and his personal credibility and trusting of others. This has been noted in [Jensen's] previous PDRs." (*Id*. ¶ 8.)

Jensen began working on the D Crew on approximately June 15, 2008. (*Id*. ¶ 10). He was transferred from C Crew to D Crew due to an altercation with a co-worker. (*Id*. ¶ 9.) Jensen received a Final Written Warning as a result of the altercation and was warned that "[i]mmediate

and sustained improvement" to his conduct was expected or he would be "subject to further disciplinary action up to and including termination of employment." (*Id.*)

In his 2008 PDR, prepared by Chris Ohrt, Jensen's then-supervisor, Jensen received a "partially meets requirements" for overall performance and a "does not meet requirements" for teamwork because of the altercation with a co-worker and for comments Jensen made to Hefele that were "out of line." (*Id.* ¶ 11.) Jensen was aware that if his performance did not improve, he faced possible termination. (*Id.*) In his 2009 PDR, Jensen again received a "partially meets requirements" for overall performance and for teamwork. (*Id.* ¶ 12.) Jensen was counseled that "he had made minimal improvement [in teamwork] for the last four years," that "he should not speak disrespectfully to others in the workplace [and that his] actions affect his personal credibility and trustworthiness which is diminished when he exhibits this disrespectful behavior," and that "[he] must show immediate and sustained improvement in respect for all team members." (*Id.*)

Jensen received or otherwise had access to numerous Equal Employment Opportunity policies during his employment with Styrolution, including policies concerning harassment and how to complain about harassment. (*Id.* ¶ 15.) During the time Jensen claims Hefele harassed him, Styrolution's complaint mechanism prescribed that Jensen should first complain to his supervisor, Ohrt, then to his supervisor's supervisor, Zdunich, and, if there was still a problem, to Marcia Nicol, Styrolution's Human Resources Manager. (*Id.* ¶ 16.)

Other Styrolution employees and Jensen frequently joked around while at work by sending prank emails, a widespread practice among many of the employees. (*Id.* ¶ 17.) Emails were sent from Jensen's work email account to Hefele's work email account, and while Hefele would respond, Jensen did not read the responses. (*Id.*)

With respect to specific harassment by Hefele, Jensen claims that he was offended when Hefele called him "T-Dog." (*Id.* ¶ 18.)[1] Jensen further contends he was harassed when: (1) Hefele made Jensen a birthday cake with writing stating that "Terry Jensen is my very best friend" (*id.* ¶ 20); (2) altered photos were placed in the break room or on a work computer depicting Jensen with Hefele's faces superimposed on Jensen's body or with both Jensen's and Hefele's faces, some of which showed Jensen and Hefele in dresses and sexually-compromising (though fully-clothed) positions (*id.* ¶ 21); (3) Hefele approached Jensen on several occasions and referred to them as being in a "relationship" (*id.* ¶ 19); (4) Hefele placed paperwork in Jensen's work area regarding homosexuals who had come out of the closet (*id.* ¶ 22); (5) Hefele said to Jensen, "I think you're gay" (*id.* ¶ 23); (6) Hefele stood and watched Jensen work on several occasions (*id.* ¶ 24); (7) Hefele put a molded piece of plastic resembling male genitalia in Jensen's work area with a note stating "you will need this when you are with Craig [Hefele] tonight" (*id.* ¶ 25); (8) Jensen saw a note that said "get well" with the faces of Jensen and Hefele

---

[1] The timing of the purported harassment and Jensen's complaints are not always clear from the record. Thus, the Court has attempted to identify dates of each where possible.

on it and that also stated "hurry back" and "I miss you" (*id*. ¶ 26); (9) Jensen walked into a shift meeting and a supervisor began playing a tape of the song "Tiny Bubbles" while Hefele and Ohrt started a bubble-making machine (*id*. ¶ 27); (10) Hefele invited Jensen to his house and purportedly drove by Jensen's house (*id*. ¶¶ 28, 29); (11) Hefele waved at Jensen from his car while Jensen was at a gas station and Jensen thought Hefele was following him (*id*. ¶ 31); (12) Hefele walked into a local restaurant and bar while Jensen was there, pointed at Jensen, and said "you see that man over there" and "I know Terry Jensen" (*id*. ¶ 32); (13) on numerous occasions, Hefele approached Jensen and made statements in the presence of others including "make sure and leave the back door open, I don't think I've got my keys tonight" (Def.'s Resp. Pl.'s Stmt. Add. Fact, Dkt. # 39, ¶ 2); (14) Hefele tried to rub Jensen's back several times and, on at least one occasion, Hefele got close to Jensen, put his hand on his shoulder, sniffed his overalls and told him he smelled good (Pl.'s Resp. Def.'s Stmt. Fact, Dkt. # 36, ¶ 33); (15) Hefele would try to sit next to Jensen at safety meetings and attempted to nudge up against Jensen in the break room (*id*. ¶¶ 35-36); and (16) Hefele stated "a lot of you to go around, Terry" and that Jensen was a "big guy." (*Id*. 37.)

The parties agree that Jensen made a final complaint to Ohrt regarding Hefele's harassment on or about March 17, 2010, and that prior to that, Jensen had complained to Ohrt approximately five to seven times that Hefele had been rubbing/touching his back. (Def.'s Resp. Pl.'s Stmt. Add. Fact, Dkt. # 39, ¶ 15). On one unspecified occasion, after touching Jensen's shoulder, Hefele asked Jensen in a "provocative" tone if he would like to come over to Hefele's house. (*Id*. ¶ 16.) Jensen immediately informed Ohrt about this incident, who said that he would take care of it. (*Id*.) Hefele again touched/rubbed Jensen's back on several occasions. (*Id*.) Jensen continued to inform Ohrt about these touching incidents immediately after each occurrence. (*Id*.) Every time Jensen complained to Ohrt, things would improve for two to five days, but then "it" would start again. (*Id*. ¶ 20.)

Hefele never directly propositioned Jensen for sex, sexual acts, or sexual favors. (Pl.'s Resp. Def.'s Stmt. Fact, Dkt. # 36, ¶ 40.) Hefele never touched Jensen below the waist and did not use any express sexually offensive language with Jensen, display sexually-suggestive pictures, or make any sexually-related or obscene jokes to Jensen, other than the plastic model resembling male genitalia. (*Id*. ¶ 42). Jensen does not know whether Hefele is homosexual or what Hefele's motivation was for the alleged harassment, but Jensen believes that Hefele gave the impression that he was gay based on his advances towards Jensen. (*Id*. ¶ 49).

At some undesignated time, Ohrt told Jensen and Hefele that if the inappropriate interaction between them did not stop then they would "land in HR and both will be terminated." (*Id*. ¶ 53.) Both Jensen and Hefele had previously been counseled by Ohrt to "stop the kidding around" with each other. (*Id*.)

On March 17, 2010, after Jensen's final complaint, which is discussed in more detail below, Ohrt counseled Jensen and Hefele "regarding the harassment between the two of them [and t]old them that any type of harassment will not be tolerated." (*Id*. ¶ 54.) Following individual discussions with Jensen and Hefele, Ohrt reported the issue to Human Resources on

3

March 22, 2010. (*Id.*)

On March 22, 2010, Nicol, Styrolution's Human Resources Manager, began an investigation into Jensen's complaint against Hefele. (*Id.* ¶ 57.) This was the first time Nicol had learned of any issue between Jensen and Hefele. (*Id.*) After meeting with Ohrt, who provided Nicol with background of the issues between Hefele and Jensen, Nicol interviewed Hefele, who denied Jensen's allegations. (*Id.* ¶¶ 58, 59.) Hefele complained to Nicol that Jensen called him "queer" and "gay." (*Id.* ¶ 59.) Nicol's notes from a meeting with Jensen's and Hefele's co-worker, Art Albert, reflect that Albert told her that Jensen called Hefele gay in front of others and Hefele "goes along with it." (*Id.* ¶ 60.) Nicol's notes also reflect that Albert said he told Jensen to stop harassing Hefele because Jensen "was the one who started it." (*Id.*)

On or about March 23, 2010, Jensen and Hefele began working different shifts, and, other than occasional contact when one of them worked overtime, never saw each other again and the alleged harassment stopped. (*Id.* ¶ 63.) Based on Nicol's investigation, Gerry Sabo, Styrolution's then-Site Manager, concluded that Jensen violated its Sexual and Other Harassment Policy and the terms of the September 2008 Final Written Warning, and, therefore, terminated his employment on July 28, 2010. (*Id.* ¶ 64.) As a result of its investigation, Styrolution also concluded that certain conduct by Hefele was unacceptable and, therefore, gave him a Final Written Warning on August 4, 2010. (*Id.* ¶ 65.) Hefele subsequently violated the terms of this Final Written Warning and was terminated on September 16, 2010. (*Id.*)

**Standard**

To prevail on a summary judgment motion, the movant must show that there is "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court views all evidence and draws all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id*.

**Analysis**

<u>Sexual Harassment</u>

Sexual harassment claims may exist both in situations where an individual is harassed by someone of the opposite sex, as well as in situations where same-sex harassment is alleged. *Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1062 (7th Cir. 2003) (explaining that "in same-sex harassment cases, the central question is whether the harassment occurred 'because of plaintiff's sex.'"). To maintain an actionable claim of sex harassment, Jensen must demonstrate that: (1) his work environment was both objectively and subjectively offensive; (2) the harassment complained of was because of his sex; (3) the conduct was either severe or

pervasive; and (4) there is a basis for employer liability. *Passananti v. Cook Cnty.*, 689 F.3d 655, 664 (7th Cir. 2012).

With respect to employer liability, because Hefele was not Jensen's supervisor, Styrolution can be held liable for Hefele's harassment only if Jensen proves that Styrolution was "negligent either in discovering or remedying the harassment." *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 569 (7th Cir. 2012). An employer is negligent if it does not "promptly and adequately respond to [the] harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011).

While the substance of Jensen's complaints to Ohrt are vague, Styrolution does not deny that prior to March 2010, Jensen complained to his supervisor, Ohrt, approximately five to seven times about Hefele attempting to rub or touch his shoulder. (Def.'s Resp. Pl.'s Stmt. Add'l Facts, Dkt. # 39, ¶ 15.) Jensen admits that Hefele's harassment stopped and things would improve for awhile, typically one to five days, after he complained to Ohrt. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 36, ¶ 52.) The parties agree that incidents in March 2010 led Ohrt to report the purported harassment of Jensen to Marcia Nicol in the Human Resources department. Jensen testified as follows regarding the incidents in March 2010:

> Q: What triggered you to go see Miss Nicol in March 2010?
>
> A: The incidents with [Hefele] had escalated to the point where he had touched me on the shoulder while I was trying to put a sample into the computer at the lab, and he had tried to sniff my shoulder and he stated I smelled good. I reported it to Chris Ohrt. I said, "You need to stop him. You need to talk to him." [Ohrt] in turn went to the – I know he did. He went to the lab and spoke to [Hefele] and told him it needed to stop. The following day, which we would have worked that day, at nighttime I went home, and again . . . [Hefele] drove by my home and waved. Did not say anything. He stayed on the public road. I in turn the next day shift went to [Ohrt] and stated, "He's droven (sic) by my house. You need to speak to him again and urge him to stop." [Ohrt] indeed – He said he would, and went to speak with him on the second time. However, on the second time, he must have got – and I'm assuming, he must have got some type of flack or disagreement and [Ohrt] stated to me that he was reporting this to Thad Zdunich who in turn reported it to human resources manager, Marcia Nicol.

(*Id.* ¶ 56.)

The report from Zdunich was the first time Nicol had heard of any issue between Jensen and Hefele and she began an investigation into Jensen's complaint on March 22, 2010. (*Id.* ¶ 57.) After Nicol interviewed several employees familiar with the events at issue, on March 23, 2010, Jensen and Hefele began working different shifts, never saw each other again and the

5

alleged harassment stopped. (*Id.* ¶¶ 58-63.)

"[W]hat is [a] reasonable [response by the employer] depends on the gravity of the harassment. . . . [and] an employer is required to take more care, other things being equal, to protect its . . . employees from serious sexual harassment than to protect them from trivial harassment." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431-32 (7th Cir. 1995). Moreover, under Title VII, the employer is only responsible for addressing harassment directed to the protected category, here, sex. *Jajeh*, 678 F.3d at 569 ("[T]he relevant inquiry is whether [the plaintiff's] complaints gave [the defendant] enough information 'to make a reasonable employer think there was some probability' that he was being harassed on the basis of his [protected classification]") (citation omitted). "Title VII does not prohibit all verbal or physical harassment in the workplace," only that directed at a protected group. *Id.* (citation and internal quotation marks omitted).

Jensen conclusorily states in his response brief that he "had been making complaints that were, on their face, complaints of sexual harassment," but fails to cite to any record evidence establishing the dates or specific content of his complaints. (Pl.'s Resp., Dkt. # 37, at 15.) While the parties agree that Jensen complained on several occasions that Hefele had tried to touch his shoulder, Jensen fails to point to any evidence that Ohrt was given enough information to think that Jensen was being harassed based on his sex. Neither party has pointed to any conclusive evidence that Hefele is gay.[2] Further, it is undisputed that Jensen and Hefele, along with other employees, engaged in workplace pranks and teasing which appear to have been an accepted part of the work environment at Styrolution. "Vague complaints unrelated to . . .

---

[2] As noted by the United States Supreme Court in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), a plaintiff in a same-sex harassment case can meet the "because of his sex" prong in three ways:

> First, a plaintiff can show that he received 'explicit or implicit proposals of sexual activity,' provided that he also comes forward with 'credible evidence' that the harasser was homosexual. Second, a plaintiff can show that he was harassed 'in such sex-specific and derogatory terms' so as to make it clear that the harasser is motivated by a 'general hostility to the presence' of one sex being in the workplace. Third, a plaintiff may offer direct comparative evidence showing that the harasser in a mixed-sex workplace treated one sex better than the other.

*Warner v. USF Holland Inc.*, No. 08 C 6823, 2012 WL 245190, at *4 (N.D. Ill. Jan. 25, 2012). Jensen does not attempt to demonstrate that the harassment was because of his sex through the second or third methods; instead, he seeks to show that Hefele made proposals of sexual activity along with credible evidence that Hefele was gay. While not opining on whether Jensen has established that he was harassed "because of" his sex, the Court makes reference to Hefele's sexuality simply to note that Ohrt did not have a basis to immediately suspect sexual harassment based on Jensen's complaints.

6

hostility [based on sex] are insufficient to establish employer liability." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 550 (7th Cir. 2011).

In addition, Styrolution took appropriate action when faced with Jensen's complaints. Jensen agrees that after reporting various types of alleged harassment to Ohrt, the harassment would stop for one to five days, and that many of the purportedly harassing incidents were not sexual in nature. Ohrt attests that Jensen's complaint on March 17, 2010 was the first time that Jensen had referred to Hefele's conduct as "sexual harassment" (Ohrt Decl., Def.'s Ex. C, ¶ 8) and even Jensen himself refers to the harassment as having "escalated" in March 2010 when Hefele put his hand on Jensen's shoulder and told him he smelled good. Immediately upon being informed of this, Orht told Hefele to stop, but the next day, Jensen complained to Ohrt that Hefele had driven by his house and waved. After another conversation with Hefele appears to have proved unfruitful, Ohrt then reported the matter to Zdunich, the unit supervisor, who in turn reported the matter to Nicol.[3] Nicol conducted an investigation on March 22, 2010 and by March 23, 2010, Jensen and Hefele were placed on different shifts and the harassment stopped. (*Id.* ¶¶ 56-63.)

"Once aware of workplace harassment, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent harassment from recurring." *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011) (citation and internal quotation mark omitted). Once Styrolution was on notice that the Jensen believed the harassment to be of a sexual nature, it immediately investigated the matter and separated Jensen and Hefele. Thus, the Court finds no basis for employer liability. A "prompt investigation is the hallmark of reasonable corrective action." *Id.* at 473 (internal quotation marks and citation omitted).

Retaliation

Title VII forbids an employer from discriminating against an employee who "opposed any practice" prohibited by Title VII or who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Jensen claims he was terminated for complaining about Hefele's alleged

---

[3] While it is not entirely clear from the record, it appears that Jensen's complaint to Ohrt about Hefele touching him on the shoulder and telling him he smelled good took place on March 17, 2010 (Ohrt Decl., Def.'s Ex. C, ¶ 8), which was a Wednesday. *See* http://www.timeanddate.com/calendar/?year=2010. Ohrt had a conversation with Hefele that day. (Pl.'s Resp. Def.'s Stmt. Fact, Dkt # 36, ¶ 56.) Jensen then complained to Ohrt on Thursday, March 18, 2010 about Hefele having driven by his house the night before and Ohrt again spoke with Hefele that day. (*Id.*) Then, on or about Monday, March 22, 2010, Ohrt reported the incident to Zdunich, who reported it to Nicol. Thus, the first complaint that Ohrt understood to be based on purported sexual harassment was reported to Human Resources within three days.

harassment. Although a party may prove retaliation under both the direct and indirect methods of proof, *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012), Jensen proceeds only under the indirect method. Under this method, Jensen may establish a prima facie case of retaliation "by showing that: (1) he engaged in a statutorily protected activity; (2) he met his employer's legitimate expectations, *i.e.*, he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity." *Harper v. C.R. England, Inc*., 687 F.3d 297, 309 (7th Cir. 2012). "Once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory reason for discharging the plaintiff." *Id*. "If the defendant meets its burden, the burden shifts back to the plaintiff to show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual." *Id*.

Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; rather, it is "lie, specifically a phony reason for some action." *Sublett v. John Wiley & Sons, Inc*., 463 F.3d 731, 737 (7th Cir. 2006) (citation omitted). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). Styrolution asserted in its statement of fact number 64 that based on Nicol's investigation, Sabo, Styrolution's then-Site Manager, concluded that Jensen violated its Sexual and Other Harassment Policy and the terms of his September 2008 Final Written Warning, and, therefore, terminated his employment on July 28, 2010. (Pl.'s Resp. Def.'s Stmt. Fact, Dkt. # 36, ¶ 64.) Jensen admitted this statement of fact. (*Id*.) This admission precludes a finding of pretext. Jensen states in a footnote to his responses to Styrolution's statements of fact that "the response 'admit' or 'admitted' is intended to mean that Plaintiff is not in possession of any admissible evidence at this time which could refute the statement of fact to which Plaintiff is responding." (Pl.'s Resp. Def.'s Stmt. Fact, Dkt. # 36, at 1 n.1.) This assertion represents a basic misunderstanding of summary judgment. As noted by the Seventh Circuit:

> We often call summary judgment, the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence []he contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely.

*Goodman v. Nat'l Sec. Agency, Inc*., 621 F.3d 651, 654 (7th Cir. 2010). By virtue of Jensen's admission, he acknowledges that Styrolution's decision to terminate him was not pretextual.

Even assuming that Jensen had not admitted this statement of fact, he still fails to point to any evidence establishing a genuine issue of material dispute as to whether Sabo honestly believed that Jensen's violation of his Final Written Warning and the Sexual and Other Harassment Policy were the reasons for Jensen's termination. Jensen notes that the Final Written Warning was issued two years prior to Jensen's termination, but fails to point to any record evidence that the lapse of time could not provide a basis for the termination. He also states that "[i]t is hard to tell how, exactly, Plaintiff violated Defendant's Sexual and Other Harassment Policy." (Pl.'s Resp., Dkt. # 37, at 11.) But despite several months of discovery,

8

Jensen still does not point to any evidence that the reason given by Styrolution is pretextual. While conclusorily asserting that Styrolution's reason is "preposterous" and "not believable," he fails to point to any specific competent evidence creating a genuine issue of material fact as to whether Styrolution's proffered reason was pretextual. Therefore, Styrolution is entitled to judgment on this claim.

**Conclusion**

  For the reasons stated above, Styrolution's motion for summary judgment [30-1] is granted. Civil case terminated.

**Date**: April 25, 2013

                 **United States District Judge**
                 **Ronald A. Guzmán**